# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SCOTT MICHAEL FUGATE,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

Defendant.

No. 14 C 4240

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Scott Michael Fugate filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act.[1] *York v. Massanari*, 155 F.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB

Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on September 6, 2011, alleging that he became disabled on May 19, 2010, due to chronic back pain and depression. (R. at 17, 108, 114). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 17, 71, 76). On February 26, 2013, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 17, 35–59). The ALJ also heard testimony from Grace Gianforte, a vocational expert (VE). (*Id.* at 17, 35–36, 59–66, 97–98).

The ALJ denied Plaintiff's request for benefits on May 10, 2013. (R. at 17–30). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of May 19, 2010. (*Id.* at 19). At step two, the ALJ found that Plaintiff's status post hemi-laminectomies of December 2005 and February 2010, his status post cerebrospinal leak repair of July 2010, his moderate obesity, and his major depression and anxiety are severe impairments. (*Id.* at 20). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 20–21).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC)[2] and determined that Plaintiff has the RFC to perform light work as defined in 20 C.F.R.

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum

§ 404.1567(b), except that he can only occasionally climb ramps and stairs or stoop, crouch, kneel, or crawl; can never climb ropes, ladders, or scaffolds; cannot do work involving public contact or frequent communication with others; and can do only unskilled, routine work that stays the same day-to-day. (R. at 22). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff cannot perform any past relevant work. (*Id.* at 28). At step five, based on the VE's testimony and Plaintiff's RFC, age, education, and work experience, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including the following representative occupations: clerical/checker; inspector/packer, and addresser. (*Id.* at 29). Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act, from the alleged onset date through the date of the ALJ's decision. (*Id.* at 30).

The Appeals Council denied Plaintiff's request for review on April 28, 2014. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regula-

---

that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

tions. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*,

763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks eviden-

tiary support or is so poorly articulated as to prevent meaningful review, the case

must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff, a high school graduate who was thirty-eight years old at the time of his

hearing, has a history of lower back pain and depression. In 2005, he reported pain

in his low back, left hip, and left leg down to his foot, together with numbness and

tingling radiating to the back of his left leg. (R. at 351–52). An MRI of June 28,

2005, revealed lumbar spinal stenosis (a narrowed spinal canal)[3] and minimal disc

bulging. (*Id*.). Based on clinical exams and Plaintiff's MRI, Leonard I. Kranzler,

M.D., a neurosurgeon, attributed Plaintiff's pain and neurological symptoms to the

spinal stenosis, not to the disc bulging. (*Id*.). After conservative treatment with

steroids and bed rest was unsuccessful, Dr. Kranzler performed a lumbar laminec-

tomy.[4] (*Id*.). Following the surgery, Plaintiff experienced relief for a time he later

estimated as four to six months. (*Id*. at 354). He "returned to a vigorous lifestyle,

---

[3] Spinal stenosis occurs when the spinal cord in the neck (cervical spine) or the spinal nerve roots in the lower back (lumbar spine) are compressed. Symptoms of lumbar stenosis often include leg pain (sciatica) and leg tingling, weakness, or numbness. <http://www.spine-health.com/conditions/spinal-stenosis> (last visited Feb. 18, 2016).

[4] A lumbar laminectomy involves removing a small portion of the bone in order to allow more room for the nerve root, with the goal of reducing pain, leg weakness, and neurological symptoms associated with spinal stenosis. <http://www.spine-health.com/treatment/back-surgery/lumbar-decompression-back-surgery> (last visited Feb. 18, 2016). Plaintiff's surgery also involved removal of some "extraordinarily thickened" connective tissue (R. at 352); such tissue can contribute to spinal stenosis. http://www.spine-health.com/glossary/ligamentum-flavum (last visited February 18, 2016).

including weightlifting," but gradually developed pain and difficulty, even in walking. (*Id*. at 343).

There is a gap in the medical records after 2005. The next available record indicates that Plaintiff was referred to a pain clinic in 2010. (R. at 354). In January and February 2010, he reported sharp pain radiating down his left leg to the ankle, at a level of 9/10, exacerbated by walking or sitting straight and alleviated by moving about. (*Id*. at 343, 354). A January 14 MRI revealed several anomalies including mild disc bulges, degeneration, and mild bilateral neural foraminal narrowing (a narrowing of the nerve passageways on both sides of the spine).[5] (*Id*. at 347). After conservative treatments and steroid injections failed to alleviate his pain, Plaintiff agreed to a repeat surgery. (*Id*. at 344).

On February 26, 2010, Plaintiff had a repeat hemi-laminectomy in which Dr. Kranzler removed additional bony protrusions, connective tissue, and scar tissue from the prior surgery. (R. at 339, 344). During the surgery, there was also an inadvertent incision into his dura mater (the outermost layer of the thick membrane around the spine) and a leak of cerebrospinal fluid. (*Id*. at 344). After surgery, Plaintiff recovered in the hospital for several days and was discharged on March 3. (*Id*. at 326–32, 339).

---

[5] Neural foraminal narrowing means nerve passageways in the spine have less space than they used to, which may cause the compression or pinching of nerves. <https://www.laserspineinstitute.com/back_problems/foraminal_narrowing/types/bilateral/> (last visited Feb. 18, 2016).

Around 4:00 am on March 5, Plaintiff developed a headache that grew progressively more severe. (R. at 304). That night he began vomiting, and on March 6, he presented at the emergency room with a severe headache, back pain, vomiting, and a fever. (*Id.* at 279–89, 304). He was admitted and treated with pain medication, which somewhat relieved his headache. He also experienced sharp pains in his neck, which were somewhat relieved with ice packs. (*Id.* at 298–300, 309). Extreme light sensitivity prompted hospital staff to draw his shades and turn off his lights. (*Id.*). When moved from the emergency department to an inpatient unit, he covered his face and head with a blanket to block the light (*Id.* at 299). The headache was initially diagnosed as musculoskeletal/paraspinal in nature, possibly caused by myelomeningocele.[6] (*Id.* at 315, 318). By March 9, his headache had improved, and he was discharged. (*Id.* at 320).

During the second hemi-laminectomy, doctors noted a cerebrospinal fluid leak, but they were unable to repair it at that time. (R. at 258). Plaintiff continued to experience post-operative fluid build-up at the site of the surgery, and by July, he had developed a cyst producing a visible bulge on his back. (*Id.* at 260). For four months following the second surgery, Plaintiff experienced headaches as a result of the loss of cerebrospinal fluid. (*Id.* at 258, 260). On July 8, 2010 Dr. Kranzler performed a third surgery to repair the leak; that surgery involved reopening the wound from his prior surgery and suturing layers of his spinal membrane together with layers of

---

[6] The term refers to protrusion of the spinal cord and its membranes through a defect in the vertebral column. <http://www.medilexicon.com/medicaldictionary.php?s= meningomyelocele> (last visited Feb. 11, 2016).

membrane that had developed around the cyst. (*Id.* at 219–20, 258). A drain was installed in his lumbar region for several days. Plaintiff remained in the hospital for a week and was discharged on July 17. (*Id.* at 258).

Records reflect that Plaintiff received ongoing treatment with Advocate Illinois Masonic Family Practice in Ravenswood (Ravenswood Clinic). In February, Dr. R. Niehaus examined him and gave him pre-operative clearance for upcoming surgery; in June, Gina Schueneman, D.O., did the same. (R. at 364, 396). Plaintiff followed-up with Dr. Niehaus on March 12, shortly after his first surgery (*id.* at 366), and again on September 22, 2011 (*id.* at 501).

At his September 2010 appointment, Plaintiff admitted to having difficulty controlling his anger, describing an incident where he had yelled at a neighbor outside; only the intervention of his wife kept him from confronting the neighbor with a knife. (R. at 501). Two days later, he began visiting a psychiatrist at the Ravenswood Clinic. He recounted irritability, pervasive anger, an erratic sleep schedule, and some depression. He also indicated that he had lost his job three months prior, in part due to downsizing and in part due to his back problems. (*Id.* at 527).

In October 2010, Plaintiff again saw Dr. Niehaus and reported decreased but continuing lower back pain radiating to his left foot, describing the pain level as 6/10. (R. at 501, 535). On an October 12, 2010, intake form for physical therapy, Plaintiff reported "pain and stiffness" in his lower back. His listed goals for physical therapy as "get active again" and "light lifting." (*Id.* at 467). That day he indicated that he was experiencing pain in his lower back and left hip, leg, and foot, at a level

of 5/10, sometimes rising to 8/10. (*Id.* at 468, 489). He reported that his pain was made worse by stairs, sitting for a long time, and walking, and that the pain improved when he changed positions or lay down. (*Id.* at 467). Asked to circle a number between one and five to indicate how much his emotional status had changed since the onset of his condition, he circled five. (*Id.*).

The record documents six visits to the physical therapist during October 2010. On October 27, Plaintiff reported "[s]ignificant improvement." (R. at 487). Plaintiff had improved 70% since beginning physical therapy, could walk for thirty minutes, could go up and down a flight of stairs, and could perform light weight lifting—all with no increase in pain. (*Id.*). Plaintiff stated that he was experiencing no pain that day, just stiffness, and that he had pain referral to his buttocks approximately twice a week. (*Id.*). The therapist indicated "all goals met," and released him to "self-management of pain" and a home exercise program. (*Id.*).

Six month later, on April 25, 2011, Plaintiff returned to Dr. Niehaus to follow up on his low back pain and his pain medications. (R. at 356). He reported a pain level of 6/10 with pain radiating to his left leg and stated that he had been doing "light exercises" at home as taught by his physical therapist but was still taking on average one Vicodin and one Valium every day. He expressed an interest in trying pool therapy at the YMCA and asked the doctor to fill out a form to clear him for that activity. (*Id.*).

In September 2011, Plaintiff filed his DIB application. On September 28, he returned to the Ravenswood Clinic, reporting a pain level of 6/10. (R. at 374, 500). He

also reported constant lower back and buttocks pain running down his left leg to the foot. (*Id.* at 374). Vicodin and stretching provided some relief, but the surgery had not helped much. Plaintiff also reported some neck and left foot pain, and indicated that his balance felt "off" and that he was sleepy. Dr. Schueneman noted that Plaintiff was in therapy for anger, and on the treatment note form circled physical symptoms including headache, tingling, and back pain. She diagnosed chronic low back pain and adjustment disorder. (*Id.*).

Thereafter, Plaintiff received monthly osteopathic manipulative treatment from David Smith, D.O., and Andrea Clem, D.O., at the Ravenswood Clinic.[7] On October 4, 2011, Plaintiff recounted low back and neck pain, with a chronic tingling sensation in his left leg. (R. at 373). Observing tightness in various areas of his musculoskeletal system and tenderness in his piriformis, Dr. Clem diagnosed somatic dysfunctions in the cranial-cervical, thoracic, and sacral areas of the spine. (*Id.* at 373, 500). On November 4, Dr. Smith observed that Plaintiff's leg was improving, but Plaintiff still had anger issues and was no longer seeing a therapist since the person he was seeing left the practice. (*Id.* at 378). Dr. Smith diagnosed chronic low back pain and adjustment disorder with anger and instability. (*Id.*). On November 8,

---

[7] According to the *Glossary of Osteopathic Terminology* published by the American Association of Colleges of Osteopathic Medicine, osteopathic manipulative treatment is the "therapeutic application of manually guided forces . . . to improve physiological function and homeostasis that has been altered by somatic dysfunction." 28 American Association of Colleges of Osteopathic Medicine, *Glossary of Osteopathic Terminology* (Nov. 2011), available at https://www.aacom.org/docs/default-source/insideome/got2011ed.pdf?sfvrsn=2 (last visited Feb. 10, 2016) (the "*Glossary*"). Manipulation is considered a compliment to, not a substitute for, conventional therapies. Emil P. Leshoe, *An Overview of Osteopathic Medicine*, 8 Archives of Fam. Med. 477, 477 (1999), available at http://triggered.edina.clockss.org/ (last visited Feb. 17, 2016).

Plaintiff reported pain at a level of eight out of ten and stated that he could not sit or stand for very long. (*Id.* at 500, 526). He also reported that, after initial soreness, his last treatment had helped somewhat.

In connection with his application for DIB, Plaintiff was examined by Fauzia A. Rana, M.D., on November 14, 2011. (R. at 402–06). Plaintiff complained of constant pain in his left lower back, radiating to the back of his left thigh with a tingling sensation, with pain at a level of 9/10 every day, plus aching pain in his right shoulder and depression because he cannot work. (*Id.* at 403). Plaintiff demonstrated moderate difficulty squatting and arising, instability attempting to hop on one leg, and a slow gait without a limp or use of an assistive device. (*Id.* at 403–04). A physical exam was otherwise normal, including all ranges of motion, except that Plaintiff complained of pain in his back on various movements. (*Id.* at 404–05). Dr. Rana opined that Plaintiff would have "some difficulty in prolonged sitting, standing, walking, lifting and carrying due to obesity and chronic low back pain." (*Id.* at 406).

Consulting psychiatrist Ana A. Gil, M.D., also examined Plaintiff on November 14, 2011. (R. at 411–14). She noted that Plaintiff's wife drove him to the appointment, and that he shifted position throughout the exam and stood once because of back pain. He expressed that he was in terrible pain every single day and experienced feelings of hopelessness, helplessness, and decreased energy, stating "I rarely even go out. . . . I can't sit for very long." (*Id.* at 411). He indicated that his wife does most of the cleaning, laundry, and grocery shopping. After a cognitive and psychological exam, Dr. Gil opined that Plaintiff's history and symptoms are indicative of

recurrent major depression without psychotic features, moderate in severity. (*Id.* at 414).

Also on November 14, 2012, Dr. Schueneman filled out a "Multiple Impairments Questionnaire" in which she reported that she had been treating Plaintiff for chronic low back pain following three surgeries plus a history of spinal stenosis and herniated discs. She described his symptoms as "constant low back pain; . . . left hip pain; pain radiates down left leg; muscle weakness; fatigue; unable to find position of comfort." (R. at 548–55). She also noted "some mid-thoracic pain." (*Id.* at 549). She concluded that he has "all bad days" with no good days; that sitting, standing, walking, and lifting all exacerbate his pain; that the range of pain he experiences is ten out of ten; that the range of his fatigue is similarly ten out of ten; and that his symptoms are not completely relieved by medication. (*Id.* at 550, 554). She opined that Plaintiff can sit for no more than one hour in an eight-hour workday and can stand or walk for no more than one hour in an eight-hour workday, and that he needs to get up and move around every twenty minutes. (*Id.* at 550). She concluded that Plaintiff would need to take unscheduled breaks to rest every twenty minutes throughout the day, lasting on average twenty minutes each. (*Id.* at 553). She further opined that he can frequently lift or carry up to five pounds, occasionally lift or carry five to ten pounds, and never lift or carry any weight in the ten-to-twenty pound range or higher. (*Id.* at 551). Due to chronic shoulder pain, Plaintiff is unable to do repetitive reaching or pulling. (*Id.*).

Dr. Schueneman further opined that Plaintiff has moderate limitations in grasping, turning or twisting objects and marked limitations in reaching (including overhead) with either hand, but minimal limitations in using his fingers/hands for fine manipulations. (R. at 551–52). She made note of Plaintiff's treatment history, including his medications, surgeries, and osteopathic manipulative treatments. (*Id.* at 552). She concluded that his symptoms would likely increase if he were in a competitive work environment, that he could not keep his neck in a constant position, and that his pain would frequently interfere with his attention and concentration. (*Id.* at 552–53). Dr. Schueneman opined that Plaintiff was physically unable to tolerate even low stress jobs. (*Id.* at 553).

Dr. Schueneman found that Plaintiff's symptoms and limitations dated back to January 2005 and based her opinion on clinical findings, including "positive straight leg test," "decreased muscle strength left lower extremity," "difficult to toe/heel walk and squat," "decreased motion of lumbar spine," and "tenderness around surgical scar." (R. at 548, 554). She further cited Plaintiff's June 2005 and January 2010 MRIs as evidence of his disc bulge, spinal stenosis, facet degeneration, and diffuse disc osteophyte complex (bone spurs). (*Id.* at 549).

On December 8, 2011, Plaintiff reported pain at 9/10, which radiated down his legs. (R. at 499, 525). He was unhappy with the outcome of his surgery; his pain was persistent and chronic. (*Id.*).

Marva Dawkins, Ph.D., a nonexamining DDS consultant, completed a Mental RFC Assessment on December 14, 2011. She found that Plaintiff is moderately lim-

ited in several work-related capabilities. (R. at 429–30). She opined that Plaintiff retains the mental capacity to understand, remember, and carry out simple, one- and two-step instructions within the limits of his physical condition. (*Id*. at 431).

On December 19, 2011, Plaintiff reported left shoulder pain at 9/10, along with back and neck pain. (R. at 499). He requested cholesterol-lowering medication "because he doesn't think he can exercise" and had already changed his diet. (*Id*. at 523). At his January 12, 2012 manipulation treatment, Dr. Smith and Dr. Schueneman noted that Plaintiff had gotten some relief from the last session, but was now complaining of pain in his upper and lower back, left hip tightness, and pain at a level of 9/10 radiating down his left buttock; non-steroidal anti-inflammatory drugs provided temporary relief. (*Id*. at 522). In February, Plaintiff reported pain at 7/10, with increased neck pain. (*Id*. at 499, 521). Dr. Schueneman diagnosed myalgia, neck pain, joint pain, back pain, and a series of somatic dysfunctions related to her clinical findings. (*Id*. at 521).

Julio Pardo, M.D., a nonexamining DDS consultant, prepared a Physical RFC assessment on December 19, 2011 (R. at 433–40), in which he opined that Plaintiff can occasionally lift twenty pounds and frequently lift ten pounds, and that he can stand or sit for six hours each in an eight-hour workday (*id*. at 434). Dr. Pardo concluded that Plaintiff can never climb ladders, ropes, or scaffolds, but he can occasionally climb ramps or stairs and occasionally kneel, crouch, and crawl. (*Id*. at 435). Dr. Pardo disagreed with Dr. Rana's conclusion that Plaintiff would have difficulty in prolonged sitting, standing, walking, lifting, and carrying because "the evi-

dence provided by the examining source reveals only a snapshot of [Plaintiff's] functioning." (*Id.* at 439).

Glen Pittman, M.D., and Young-Ja Kim, M.D., reviewed the record and, in March 2012, affirmed the prior physical and mental RFC assessments. (R. at 455–57). One of the reviewing physicians commented that Plaintiff "had some other complaints related to somatic dysfunction, which was the only description of mental impairment." (*Id.* at 457).

At his March 6, 2012 manipulation treatment, Plaintiff complained of stiffness from "playing basketball this weekend with his son, moderate intensity." (R. at 520). Dr. Schueneman assessed him with low back pain alleviated by manipulation treatments and oral pain control, and again made clinical findings relevant to his various spinal segments plus bilateral hamstring tightening and restrictive extension in the left shoulder. (*Id.*). On April 11, Plaintiff complained of headache pain at 8–9/10, accompanied by mild nausea and photosensitivity, which resolved temporarily with rest. His low back pain had improved mildly since his last visit but was reportedly at a level of eight that day. (*Id.* at 519).

On April 13, 2012, Plaintiff sustained a head injury in an altercation. In his hearing testimony, he explained that he had exchanged words with someone blocking an alley, and that several people had subsequently assaulted him. (R. at 58–59). He suffered a concussion but no apparent loss of consciousness. (*Id.* at 546–47). A speech-language specialist, who evaluated him for brain injury the next day, diagnosed "mild traumatic head injury." (*Id.* at 464).

In a visit to his primary doctor on May 7, 2012, Plaintiff reported pain of 10/10 in his left upper back and ribs, along with left flank pain, which worsens with movement. (R. at 498, 517–18). Dr. Schueneman prescribed pain medications and rest with no contact activities. (*Id.* at 517). Dr. Smith's June 2012 physical exam found osteoarthritic restrictions in the cervical spine and restrictions in the thoracic, lumbar, sacral, and pelvic spine, all of which are listed as specific types of somatic dysfunctions. (*Id.* at 514–16).

In a letter dated June 14, 2012, Dr. Schueneman described Plaintiff as "still quite physically limited." (R. at 565). She opined that Plaintiff cannot lift more than ten pounds, cannot walk more than ten minutes before sitting, and cannot sit more than five minutes without adjusting his body position. (*Id.*). She concluded that Plaintiff's prognosis is poor, opining that Plaintiff's impairments would endure life long and preclude him from competitive work. (*Id.*).

On October 18, 2012, Dr. Jewison gave Plaintiff an injection in his left shoulder for pain symptoms that had worsened over the prior two weeks. (R. at 502, 506–07). Plaintiff reported that his shoulder pain is worst in the morning and awakens him from sleep. Lifting "light weights" overhead causes him pain. (*Id.* at 506). A week later, on October 25, he reported that the pain injection in his shoulder had been effective, but he still had hip and mid-thoracic pain; Dr. Smith diagnosed chronic low back pain and various segmental dysfunctions. (*Id.* at 502–04).

Finally, on February 17, 2013, Dr. Smith completed a Multiple Impairments Questionnaire that appears remarkably similar to that completed by his colleague

Dr. Schueneman three months prior. (*Compare* R. at 548–55, *with id.* at 557–64). In fact, in the thirty-eight instances in which the form requests a "check-the-box" or "circle-the-number" response, all thirty-eight of Dr. Smith's responses align with Dr. Schueneman's. (*Id.*). These included, for example, the assessments that the Plaintiff's pain and fatigue are both a constant ten out of ten, and that Plaintiff can sit for no more than one hour in an eight-hour work day. (*Id.*). The responses to all short-answer questions are likewise identical, with only the longer responses varying their wording slightly.

At his hearing on February 6, 2013, Plaintiff reported that his 2005 surgery had afforded him temporary relief, but that everything had been "downhill" since the second surgery in 2010. (R. at 41–42). He testified that he had not been able to drive for about five years because of low back pain; in written testimony, he described discomfort with turning the wheel or looking over his shoulder (*Id.* at 38, 154). He spends 10–12 hours each day lying down and otherwise alternates between sitting, standing, and walking, requiring a change of position every 15 or 20 minutes. (*Id.* at 40–42). He can walk just one block and back, cannot lift more than five pounds at a time per orders from his doctors, and stopped lifting light weights in 2005. (*Id.* at 42, 45–46). His written testimony indicates that, for exercise, he walks to the end of the block and back and performs prescribed physical therapy exercises. (*Id.* at 130). He stated that he can wash a few dishes, and can go the grocery store if his wife gives him a short list. (*Id.* at 42–43). His medications cause drowsiness and blurred vision. (*Id.* at 43).

Plaintiff's wife drives them to visit his parents in Lake Zurich, which requires a 40-minute drive, approximately once every two months, and in 2012 he took one longer trip to Fort Wayne, Indiana to see an aunt. (R. at 46). That trip, normally a two-and-a-half-hour drive, took longer because his father, who was driving, took frequent stops so Plaintiff could stretch his legs. (*Id.* at 52–53).

## V. DISCUSSION

Plaintiff raises two arguments in support of his request for reversal: (1) the ALJ improperly weighted the opinions of Drs. Schueneman and Smith, Plaintiff's treating physicians; and (2) the ALJ's credibility determination was patently wrong.

### A. The ALJ's Evaluation of the Opinion Evidence Is Not Supported by Substantial Evidence.

Plaintiff contends that the ALJ failed to give good reasons for giving only "minimal weight" to the opinions of Drs. Schueneman and Smith, his treating physicians. (Dkt 11 at 8–12). Plaintiff asserts that even if the ALJ declined to extend controlling weight to those opinions, the ALJ was required to assess their weight in accordance with the regulatory checklist of factors. (*Id.* at 8, 12–13). Drs. Schueneman and Smith found, *inter alia,* that Plaintiff can lift less than five pounds frequently and five to ten pounds occasionally, can sit for no more than one hour in an eight-hour period, can stand or walk for no more than one hour in an eight-hour period, needs to get up and move around every twenty minutes, and needs to take unscheduled breaks to rest every twenty minutes throughout the day, each lasting on average twenty minutes. (R. at 550–55, 557–64).

In Social Security disability claims, the opinion of a treating physician is afforded controlling weight if it is both "well-supported" by clinical and diagnostic evidence and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Because of a treating doctor's "greater familiarity with the claimant's condition and circumstances," *Gudgel v. Barnhard*, 345 F.3d 467, 470 (7th Cir. 2003), an ALJ must "offer 'good reasons' for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Stage v. Colvin*, — F.3d —, 2016 WL 492333 at *5 (7th Cir. Feb. 9, 2016). Those reasons must be "supported by substantial evidence in the record; a contrary opinion of a non-examining source does not, by itself, suffice." *Campbell*, 627 F.3d at 306. Where the opinions of treating and nontreating physicians contradict one another, the ALJ must decide which doctor to believe, considering such factors as "the length, nature, extent of the treatment relationship; frequency of examination; [each] physician's specialty, the type of tests performed, and the consistency and supportability of [each] opinion." *Scott*, 647 F.3d at 740; *Books v. Chater*, 91 F.3d 972 (1996). The ALJ must then provide a "sound explanation" for that decision. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

In his decision, the ALJ gave "minimal weight" to Drs. Schueneman's and Smith's opinions. (R. at 26–27). Specifically, the ALJ concluded that Drs. Schueneman's and Smith's opinions relied on Plaintiff's subjective reports and were not supported by the record, inconsistent with Plaintiff's work history, inconsistent with

Plaintiff's physical activities and abilities, and contradicted by the state agency consultants' opinions. (*Id.* at 26–28).

Under the circumstances, the ALJ's decision to give Drs. Schueneman's and Smith's opinions "minimal weight" is legally insufficient and not supported by substantial evidence. First, the ALJ erroneously rejected Drs. Schueneman's and Smith's opinions because they were based on Plaintiff's subjective reports. (R. at 26–27). If an opinion is "based *solely* on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added); *see also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."). But here, the treating physicians' opinions were based not only on Plaintiff's complaints but also on their own examinations and clinical findings. (R. at 520, 548, 554, 557). Moreover, almost all diagnoses require some consideration of the claimant's subjective symptoms, and here, Plaintiff's subjective statements were necessarily factored into the treating physicians analyses. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012 ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). And there is nothing in the record to suggest that either Dr. Schueneman or Dr. Smith disbelieved Plaintiff's descriptions of his symptoms, or that they relied more heavily on Plaintiff's descriptions than the test results and their own clinical observations in

concluding that Plaintiff was seriously impaired. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [Plaintiff's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."); *see also Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations.").

Second, the ALJ misapprehends the medical record. For example, he concluded that Dr. Schueneman had "limited longitudinal familiarity" with Plaintiff's medical history because she diagnosed low back pain "status post *three* back surgeries," when "the medical source was not aware specifically that the claimant only had undergone two back surgeries." (R. at 26). But Plaintiff did, indeed, have *three* back surgeries: a hemi-laminectomy in 2005, a hemi-laminectomy revision in February 2010, and a cerebrospinal leak repair in July 2010, after which Plaintiff was hospitalized for a week with a lumbar drain. (*Id.* at 351–52, 339, 219–20).    The ALJ also faults Dr. Schueneman for relying on 2005 and 2010 MRIs that predated his back surgeries. The ALJ contends that these MRI's only "showed some degeneration and disk bulging" (*id.* at 26), which is not the case. Both scans also revealed narrowing in segments of the spinal canals. (*Id.* at 351–52, 347). Dr. Kranzler, Plaintiff's neu-

rosurgeon, opined that Plaintiff's symptoms were due the narrowing, and not to the mild degeneration and disk bulging. (*Id.* at 351–52).

The ALJ also misapprehends a key medical term. In describing a April 25, 2011 treatment note, the ALJ said that Plaintiff "also alluded to somatic dysfunction, which signifies that a precise medical etiology did not describe the claimant's complaints, merely his subjective perception." It is unclear where the ALJ found this definition of "somatic dysfunction." For osteopathic medicine doctors, including Drs. Schueneman and Smith, "somatic dysfunction is defined as the impaired or altered function of related components of the somatic (bodywork) system including: the skeletal, arthrodial, and myofascial structures, and their related vascular, lymphatic, and neural elements." <https://en.wikipedia.org/wiki/Somatic_ dysfunction> (last visited Feb. 26, 2015). This misunderstanding on the part of the ALJ caused him to overlook substantial portions of the treating physicians' treatment records.

The ALJ erroneously asserts that because Plaintiff's primary doctor did not refer him back to his treating surgeon, Plaintiff symptoms must not have been severe. (R. at 26). To the contrary, the record indicates that surgery afforded Plaintiff only temporary relief. The spinal stenosis that was surgically treated in 2005 reoccurred in early 2010. (*Id.* at 343–44, 354). Following the July 2010 surgery to repair a spinal fluid leak caused during the February 2010 surgery, Plaintiff reported only a brief period of improvement before describing a return of his pre-surgery symptoms by April 2011. (*Id.* at 356). He also expressed a desire to avoid any additional sur-

geries. (*Id.* at 42). In any event, the ALJ does not identify any medical evidence suggesting that another surgery would be helpful.

Third, the treating physicians' opinions are supported by the record. A September 2011 treatment note indicates dysfunctions in Plaintiff's "central cervical, thoracic, sacrum" and remarks that the Plaintiff will return for osteopathic manipulative treatment. (R. at 373–74). In October 2011, Dr. Clem found tightness in various areas of Plaintiff's musculoskeletal system and tenderness in his piriformis, and diagnosed somatic dysfunctions in the cranial-cervical, thoracic, and sacral areas of the spine. (*Id.* at 373, 500). In a November 2011 examination performed by Dr. Rana, Plaintiff had moderate difficulty squatting and arising, instability attempting to hop on one leg, and a slow gait without a limp or use of an assistive device. (*Id.* at 403–04). On the same day, Plaintiff shifted positions throughout Dr. Gil's examination and had to stand because of his back pain. (*Id.* at 411). In February 2012, after a clinical examination, Dr. Schueneman diagnosed myalgia, neck pain, joint pain, back pain, and a series of somatic dysfunctions. (*Id.* at 521). In March, Dr. Schueneman found bilateral hamstring tightening and restrictive extension of Plaintiff's left shoulder. (*Id.* at 520). During a June 2012 physical examination, Dr. Smith found osteoarthritic restrictions in the cervical spine and restrictions in the thoracic, lumbar, sacral, and pelvic spine. (*Id.* at 514–16).

Fourth, the ALJ's decision to give the treating physicians' opinions minimal weight because they were "inconsistent with work after onset" (R. at 27) is contrary to law and not supported by substantial evidence. The Seventh Circuit has repeat-

edly noted that "the fact that a person holds down a job doesn't prove that he isn't disabled." *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003). In some circumstances, "even persons who *are* disabled . . . cope with their impairments and keep working long after they might have been entitled to benefits." *Czarnecki v. Colvin,* 595 F. App'x 635, 644 (7th Cir. 2015) (quoting *Shauger v. Astrue,* 675 F.3d 690, 697 (7th Cir. 2012)). Here, the record shows that, for a period of less than six months, Plaintiff worked for *eight hours per week*, in two weekly shifts of just four hours each, at a job where he was allowed to alternate position between standing, sitting on a stool, and walking. (R. at 39, 42–43). He eventually determined that even that level of activity was more than he could bear. (*Id.* at 39, 42–43, 52). This limited level of work is not inconsistent with the treating physicians' findings that Plaintiff is in pain, needs to shift frequently from a seated to standing position, and can handle only low-stress work. (*Id.* at 550–55, 557–64). Further, Plaintiff's "unsuccessful attempts to pursue various vocations might just as easily provide corroboration that [his] impairments significantly limited [his] ability to work, as opposed to evidence that [his] ability was greater than [he] alleged." *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011).

Similarly, the ALJ's reasoning that Dr. Schueneman's opinion is inconsistent with Plaintiff's "forty work applications he made after disability onset to obtain unemployment insurance" (R. at 27) is contrary to Seventh Circuit precedent. Applying for work does not necessarily mean that Plaintiff is *capable* of *full-time* work. *Cf. Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[W]e are hard-pressed to un-

derstand how Jelinek's brief, part-time employment supports a conclusion that she was able to work a full-time job, week in and week out, given her limitations."). The Seventh Circuit has held that a Social Security claimant's certifying that he is able to work for the purpose of collecting unemployment insurance benefits might have some bearing on his credibility. *Lott v. Colvin,* 541 F. App'x 702, 707 (7th Cir. Oct. 16, 2013); *Schmidt v. Barnhart,* 395 F.3d 737, 746 (7th Cir. 2005). However, an ALJ cannot consider ability-to-work certifications and job applications to reject a treating physician's opinion unless the ALJ also addresses any reasons that the claimant provides for his actions. *Richard v. Astrue,* 370 F. App'x. 727, 732 (7th Cir. Apr. 13, 2010). For example, financial desperation might drive someone to falsely certify that to certify that she can work. *Id.* Or, "a claimant might seek a job in ignorance of the nature of his conditions, only to find later, after being hired, that his attempt to work is unsuccessful due to his disabilities." *Heldenbrand v. Chater,* 132 F.3d 36, 1997 WL 775098, at *13 (7th Cir. Dec. 15, 1997). Here, Plaintiff testified that at the time he was submitting job applications and receiving unemployment insurance benefits, he hoped to find work that he could do despite his limitations. Later, he learned that even an eight-hour-a-week job was impossible. (R. at 47, 49, 52). Such actions do not undermine Dr. Schueneman's opinion.

Fifth, Plaintiff's trip to Indiana as the passenger in a car (R. at 26–27), is not inconsistent with his physicians' opinions. During the 2012 trip to Fort Wayne, Indiana, Plaintiff's father stopped several times during the drive out of concern for Plaintiff's need to stretch his legs, and the trip still caused him pain. (*Id.* at 46–47,

53). The ALJ also cited Plaintiff's "light housework" as further evidence that his abilities exceeded those described by his doctors. (*Id.* at 27). But the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Plaintiff's testimony that he was able to wash only a few dishes (R. at 42–43) indicates that his "light housework" as performed was not inconsistent with the limitations reported by his treating doctors. The ALJ also contends that Plaintiff's ability to get into an altercation with his neighbors proves that he is "mobile." (*Id.* at 23). But Plaintiff's doctors do not contend that he is immobile; instead, they opine that his pain and fatigue will make it unlikely that he can physically withstand full-time work.

Finally, the ALJ decision to give "substantial weight" to the nonexamining, state agency medical consultants and adopt the physical RFC findings of Dr. Pardo, over the treating physicians' opinions, is contrary to law. (R. at 28). An ALJ cannot reject the treating physicians' opinions merely because they are at odds with a state agency medical consultant's opinion. *See Gudgel*, 345 F.3d at 470 ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."). Dr. Pardo found that Plaintiff could perform light work—sitting or standing for up to six hours in a given work day—with some limitations. (R. at 433–40). In his assessment, Dr. Pardo cited Dr. Rana's clinical findings but rejected her con-

clusions, explaining that "the evidence provided by the examining source reveals only a snapshot of the claimant's functioning." (*Id.* at 439). But Dr. Pardo did not indicate which evidence contradicted that "snapshot," providing only the details of Dr. Rana's own examination as support for his rejection of her conclusions. Neither Dr. Pardo nor the ALJ identifies which medical evidence supports their conclusion that Plaintiff has the ability to sit or stand for six hours in a work day. Further, Dr. Pardo examined the record and prepared his opinion in December 2011, before over 100 pages of medical records were subsequently submitted, including the treating physicians' opinions. *See Jelinek*, 662 F.3d at 812 (criticizing ALJ for relying on stale DDS opinions over that of the more recent treating physician opinion); *Scott*, 647 F.3d at 734, 739–40 (DDS opinion did not take into account the entire record). The ALJ's reliance on Dr. Pardo's RFC Assessment was therefore misplaced.

The ALJ also assigned "substantial weight" to the opinions of Drs. Kim and Pittman, two other nonexamining medical consultants who reviewed the record and confirmed Dr. Pardo's RFC assessment, finding their conclusions "consistent with the record as a whole and [with] work that the claimant performed after onset for five months." (R. at 28). However, by referring to somatic dysfunction as a "mental impairment," the opinions of Drs. Kim and Pittman rest on a misunderstanding of substantial portions of the record, as discussed above.

Even where a treating doctor's opinion is not given controlling weight, an ALJ must still "address the appropriate weight to give that opinion." *Stage,* 2016 WL 492333, at *5; *see also Scott*, 647 F.3d at 740; *Campbell*, 627 F.3d at 308. In making

that determination, the regulations require the ALJ to consider a variety of factors, including: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the types of tests performed; and (5) the consistency and support for the physician's opinion. 20 C.F.R. § 416.927(d)(2); *Campbell,* 627 F.3d at 308. Here, Plaintiff has a substantial history of care at the Ravenswood Clinic, and visited the Clinic monthly throughout the relevant time period. On remand, if the ALJ elects not to give controlling weight to the treating physicians' opinions and provides good reasons for doing so, he must still evaluate the required regulatory factors and provide a "sound explanation" for whatever weight he gives to those opinions. *Punzio,* 630 F. 3d at 710.

## B. The ALJ's Credibility Assessment Was Based on a Flawed Understanding of the Medical Record.

Plaintiff also contends that the ALJ's unfavorable assessment of his credibility was not supported by substantial evidence. (Dkt. 11 at 13–15). As Plaintiff notes, the ALJ's credibility assessment flowed in part from the ALJ's failure to recognize "extensive clinical and diagnostic abnormalities . . . such as those detailed by the treating doctors, before concluding treatment records failed to show any significant findings." (*Id.* at 14). The Court agrees. On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [10] is **GRANTED**, and Defendant's Motion for Summary Judgment [18] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: March 16, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge